## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **MARIO R. DIAZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-14-CV-227-KC** |
| | § | |
| **FEDERAL RESERVE BANK OF** | § | |
| **DALLAS,** | § | |
| | § | |
| **Defendant**. | § | |

## ORDER

On this day, the Court considered Plaintiff's Motion for Partial Summary Judgment and Brief in Support ("Plaintiff's Motion"), ECF No. 48, and Defendant Federal Reserve Bank's Motion for Summary Judgment ("Defendant's Motion"), ECF No. 49, in the above-captioned case (the "Case"). After due consideration, the Court **DENIES** Plaintiff's Motion, and **GRANTS** Defendant's Motion in its entirety.

## I.    BACKGROUND

### A.    Factual Background

Unless otherwise indicated, the following facts are undisputed. Defendant Federal Reserve Bank of Dallas ("Defendant") is one of twelve regional reserve banks in the Federal Reserve System. *See* Def. Federal Reserve Bank of Dallas' Proposed Undisputed Facts ¶ 1 ("Defendant's Facts"), ECF No. 49-1; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶ 1 ("Plaintiff's Response to Defendant's Facts"), ECF No. 54-7. On or about March 1, 1991, Defendant hired Plaintiff Mario R. Diaz ("Plaintiff") as a security officer in the Law Enforcement Unit ("LEU") of its El Paso, Texas branch. *See* Pl.'s Factual App. to his Mot. for Partial Summ. J. ¶ 3 ("Plaintiff's Facts"), ECF No. 47; Federal Reserve Bank of Dallas' Resp. to

Pl.'s Proposed Undisputed Facts ¶ 3 ("Defendant's Response to Plaintiff's Facts"), ECF No. 50-1; *see also* Def.'s Facts ¶ 2; Pl.'s Resp. to Def.'s Facts ¶ 2.  During his approximately twenty-three years of employment, Plaintiff was promoted on three different occasions.  Def.'s Facts ¶ 2; Pl.'s Resp. to Def.'s Facts ¶ 2; Pl.'s Facts ¶¶ 3-6; Def.'s Resp. to Pl.'s Facts ¶¶ 3-6.  From January 1, 2002, to the date of his termination, Plaintiff held the position of Lieutenant II.  Def.'s Facts ¶ 2; Pl.'s Resp. to Def.'s Facts ¶ 2; Pl.'s Facts ¶¶ 3-6; Def.'s Resp. to Pl.'s Facts ¶¶ 3-6.

As a Lieutenant II, Plaintiff reported directly to Harry Kirk ("Chief Kirk"), the LEU Chief of Police.  Def.'s Facts ¶ 3; Pl.'s Resp. to Def.'s Facts ¶ 3.  Because the position of Lieutenant II is considered a management position, Plaintiff had supervisory authority over subordinate officers.  Def.'s Facts ¶ 4; Pl.'s Resp. to Def.'s Facts ¶ 4.  Thus, when Chief Kirk was unavailable or absent, one of the Lieutenants was placed in charge of the LEU.  Def.'s Facts ¶ 3; Pl.'s Resp. to Def.'s Facts ¶ 3.

As a security measure, Defendant records certain phone lines in its El Paso branch, including the main extension and the officer posts.  Def.'s Facts ¶ 10; *see also* Pl.'s Facts ¶ 7.  In October 2011, Defendant upgraded its phone recording system.  Def.'s Facts ¶ 11; Pl.'s Resp. to Def.'s Facts ¶ 11.  Plaintiff was assigned the task of ensuring that all phone lines that were previously recorded would remain recorded on the new system, and to listen to the recordings to confirm that their integrity had been maintained during the switch-over.  Def.'s Facts ¶ 11; Pl.'s Resp. to Def.'s Facts ¶ 11.

During this review, Plaintiff discovered four lines which had been recorded despite not being listed on the original recording list.  Def.'s Facts ¶ 12; Pl.'s Resp. to Def.'s Facts ¶ 12; *see also* Pl.'s Facts ¶ 7(i); Def.'s Resp. to Pl.'s Facts ¶ 7(i).  One of those numbers belonged to Chief Kirk.  Def.'s Facts ¶ 12; Pl.'s Resp. to Def.'s Facts ¶ 12; *see also* Pl.'s Facts ¶ 7(i); Def.'s Resp.

to Pl.'s Facts ¶ 7(i).  Plaintiff listened to Chief Kirk's line and came across a call between Chief

Kirk and Officer Armida Garcia ("Officer Garcia").  Def.'s Facts ¶ 12; Pl.'s Resp. to Def.'s Facts

¶ 12; *see also* Pl.'s Facts ¶ 7(i); Def.'s Resp. to Pl.'s Facts ¶ 7(i).  The content of the phone call

suggested that Chief Kirk and Officer Garcia were involved in a romantic relationship.  Def.'s

Facts ¶ 13; Pl.'s Resp. to Def.'s Facts ¶ 13.  Plaintiff contacted Judy Poe in Defendant's IT

department and requested that she remove all of the lines that should not have been recorded

from the recording list, including Chief Kirk's personal office line.  Def.'s Facts ¶ 12; Pl.'s Resp.

to Def.'s Facts ¶ 12; *see also* Pl.'s Facts ¶ 7(ii); Def.'s Resp. to Pl.'s Facts ¶ 7(ii).  Plaintiff did

not, however, report the content of the recording between Chief Kirk and Officer Garcia to

anyone in Defendant's management or human resources department.  Def.'s Facts ¶ 15; Pl.'s

Resp. to Def.'s Facts ¶ 15.  Instead, Plaintiff saved a copy of Chief Kirk's phone call to his work

computer.  Def.'s Facts ¶ 14; Pl.'s Resp. to Def.'s Facts ¶ 14.  Shortly thereafter, Plaintiff

transferred the recording to his personal e-mail account, and deleted it from his work computer.

Def.'s Facts ¶ 14; Pl.'s Resp. to Def.'s Facts ¶ 14.

On May 10, 2013, Lieutenant Larry Pearson ("Lt. Pearson") initiated a formal complaint

alleging that one of his co-workers, Lieutenant Martin Cardona ("Lt. Cardona"), had falsified

officer training records while acting in his capacity as LEU training coordinator for Defendant's

El Paso branch office (the "Pearson Complaint").  *See* Def.'s Facts ¶ 16; Pl.'s Resp. to Def.'s

Facts ¶ 16.  Specifically, Lt. Pearson alleged that Officer Garcia and Sergeant Petrina Smoot had

both failed certain firearms qualifications, but were not required to re-qualify because Lt.

Cardona falsified their records to show that both officers received passing grades.  *See* Def.'s

Facts ¶ 17; Pl.'s Resp. to Def.'s Facts ¶ 17.

On or about May 13, 2013, Lieutenant Millie Bogle ("Lt. Bogle") filed a separate

complaint with Defendant's human resources department against Chief Kirk (the "Bogle Complaint"). *See* Def.'s Facts ¶ 19; Pl.'s Resp. to Def.'s Facts ¶ 19; *see also* Pl.'s Facts ¶ 9; Def.'s Resp. to Pl.'s Facts ¶ 9. Although the parties sharply disagree over how the Court should characterize the Bogle Complaint, Lt. Bogle's allegations are detailed in various interview notes, internal memoranda, and witness statements, all of which are part of the summary judgment record. As a result, the allegations underlying the Bogle Complaint are largely undisputed.

In her complaint, Lt. Bogle accused Chief Kirk of creating a "hostile work environment" by making derogatory comments about her character and job performance to other LEU employees. *See* Lt. Bogle Dep. 18:15-20:17, 64:5-22, Feb. 17, 2015, Pl.'s Mot. Attach. 2, ECF No. 48-2; Questions for Millie Bogle, Pl.'s Mot. Attach. 6 Ex. E ("Bogle Interview Answers"), ECF No. 48-6; E-mail from Greg Carpenter, Human Resources Manager, to Tyrone Gholson, Equal Employment Opportunity Officer (June 7, 2013), Pl.'s Mot. Attach. 6 Ex. F ("Carpenter Memo"), ECF No. 48-6. Lt. Bogle also reported her suspicions that Chief Kirk and Officer Garcia were involved in an inappropriate sexual relationship, and claimed that after she disciplined Officer Garcia, Chief Kirk "start[ed] to treat [her] differently" and "kept [her] out of the loop." Lt. Bogle Dep. 33:18-25; *see also* Bogle Interview Answers; Carpenter Memo. Lt. Bogle further asserted that Chief Kirk showed favoritism towards certain LEU employees, including Officer Garcia, and reiterated some of the integrity issues that Lt. Pearson raised in his earlier complaint to human resources.[1] *See* Lt. Bogle Dep. 54:21-55:8; Bogle Interview Answers; Carpenter Memo. Finally, Lt. Bogle also "expressed concern that she ha[d] not been promoted" to the position of Lieutenant II, and raised the possibility "that she ha[d] been

---

[1] While Lt. Bogle gave a separate witness statement in support of the Pearson Complaint, *see* May 10, 2013, Lt. Bogle Witness Statement, Pl.'s Mot. Attach. 6 Ex. D, ECF No. 48-6, she also raised integrity concerns of her own regarding the manner in which Chief Kirk and Lt. Cardona administered an annual pistol competition. *See* Bogle Interview Answers; Carpenter Memo. Because these allegations are not relevant to any of Plaintiff's claims in this Case, the Court does not discuss them further here.

discriminated against based upon her gender."  Carpenter Memo; *see also* Lt. Bogle Dep. 88:14-89:21.

During the same time frame as the Pearson Complaint and the Bogle Complaint, Plaintiff informed Lt. Pearson that he was in possession of an October 2011 audio recording between Officer Garcia and Chief Kirk that suggested that the two were involved in a sexual relationship. *See* Def.'s Facts ¶ 22; Pl.'s Resp. to Def.'s Facts ¶ 22.  This conversation with Lt. Pearson was the first time Plaintiff had told anyone in the LEU about the recording.  *See* Def.'s Facts ¶ 22; Pl.'s Resp. to Def.'s Facts ¶ 22.  Lt. Pearson relayed this information to Lt. Bogle, who in turn reported the existence of the recording to Rosa Vega ("Ms. Vega"), a member of Defendant's human resources department.  *See* Def.'s Facts ¶ 22; Pl.'s Resp. to Def.'s Facts ¶ 22.

On May 14, 2013, Ms. Vega called Plaintiff into her office and asked if he was in possession of a recorded conversation between Chief Kirk and Officer Garcia.  *See* Def.'s Facts ¶ 23; Pl.'s Resp. to Def.'s Facts ¶ 23.  Plaintiff informed Ms. Vega that he was in possession of such a recording, and played it for Ms. Vega from his mobile phone by accessing his personal e-mail account.  *See* Def.'s Facts ¶ 23; Pl.'s Resp. to Def.'s Facts ¶ 23.  Plaintiff then e-mailed a copy of the recording to Ms. Vega at her request.  *See* Def.'s Facts ¶ 23; Pl.'s Resp. to Def.'s Facts ¶ 23.

A day or two following this initial meeting, Plaintiff met again with Ms. Vega regarding his possession of the recording.  *See* Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts ¶ 24.  This time, however, Defendant's Assistant Vice President, Javier Jimenez ("Mr. Jimenez"), was also present.  *See* Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts ¶ 24.  Mr. Jimenez asked Plaintiff "how [he] came about [the] recording," and "why [he] didn't report it to anyone" until May 2013.  Diaz Dep. 104:13-105:9, Feb. 25, 2015, Pl.'s Mot. Attach. 1, ECF No. 48-1; *see also*

Jimenez Dep. 45:16-46:12, Feb. 17, 2015, Pl.'s Mot. Attach. 3, ECF No. 48-3.  According to Mr. Jimenez, Plaintiff responded that the reason he did not immediately come forward with the recording was because he "did not need it then."  *See* Decl. of Javier Jimenez ¶ 6, Def.'s Mot. Attach. 6 Ex. E, ECF No. 49-6; *see also* Jimenez Dep. 46:1-2, 56:6-7.  Plaintiff expressly denies ever making this statement, and instead claims that he told Mr. Jimenez that he did not come forward immediately with the recording because he "wasn't trained on what to do on a casual conversation of that nature."  Diaz Dep. 105:6-22.  According to Plaintiff, when Mr. Jimenez told him that the recording "could possibly be illegally obtained," Plaintiff responded that he obtained the recording as part of his job.  *Id.* at 106:2-11.

Defendant assigned Greg Carpenter ("Mr. Carpenter"), a human resources manager from Defendant's Dallas, Texas office, to investigate the Bogle Complaint.  *See* Def.'s Facts ¶ 20; Pl.'s Resp. to Def.'s Facts ¶ 20; Pl.'s Facts ¶ 12; Def.'s Resp. to Pl.'s Facts ¶ 12.  Mr. Carpenter traveled to Defendant's El Paso, Texas office to conduct interviews with LEU employees, including Plaintiff.  *See* Def.'s Facts ¶ 20; Pl.'s Resp. to Def.'s Facts ¶ 20; Pl.'s Facts ¶ 12; Def.'s Resp. to Pl.'s Facts ¶ 12.  During the interview, Mr. Carpenter asked Plaintiff questions regarding a variety of topics, including the nature of Chief Kirk's relationship with Officer Garcia, Chief Kirk's behavior as the leader of the LEU, whether Chief Kirk showed favoritism towards Officer Garcia, and the circumstances surrounding Plaintiff's acquisition of the audio recording between Chief Kirk and Officer Garcia.  *See* Questions for Mario Diaz, Pl.'s Mot. Attach. 6 Ex. I ("Plaintiff Interview Answers"), ECF No. 48-6.  Plaintiff's answers to Mr. Carpenter's questions were reduced to writing.  *See* Pl. Interview Answers.

On June 21, 2013, Defendant terminated Plaintiff's employment.  *See* Def.'s Facts ¶ 25; Pl.'s Resp. to Def.'s Facts ¶ 25; Pl.'s Facts ¶ 16; Def.'s Resp. to Pl.'s Facts ¶ 16.  According to

Plaintiff, Mr. Jimenez called him into a meeting and explained that the bank had lost confidence in Plaintiff's ability to perform his job because of the manner in which Plaintiff had handled the recorded phone conversation between Chief Kirk and Officer Garcia.  Diaz Dep. 107:14-20.  Mr. Jimenez made the decision to terminate Plaintiff in consultation with two other high-ranking officials – Roberto Coronado, Defendant's Assistant Vice President in Charge for the El Paso branch office, and Blake Hastings, Defendant's Senior Vice President in Charge at the San Antonio branch office.  *See* Def.'s Facts ¶¶ 1, 26; Pl.'s Resp. to Def.'s Facts ¶¶ 1, 26.  As of the dates of their respective depositions in this Case, Defendant had not terminated either Lt. Bogle or Lt. Pearson.  *See* Lt. Bogle Dep. 5:3-8; Lt. Pearson Dep. 5:19-23, Feb. 16, 2015, Pl.'s Mot. Attach. 5, ECF No. 48-5.  Since initiating her grievance, Lt. Bogle has been promoted to the position of Lieutenant II.  *See* Lt. Bogle Dep. 6:2-11.

### B.     Procedural History

On August 15, 2013, Plaintiff filed a formal charge of discrimination with the Texas Workforce Commission Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC").  *See* Charge of Discrimination, Def.'s Mot. Attach. 2 Ex. 23, ECF No. 49-2.  In his EEOC charge, Plaintiff described the particulars of his allegations as follows:

> I was discharged from my job of Lieutenant II on 06-21-13.  Prior to termination, I provided witness testimony in a complaint of sex discrimination regarding a female employee, Armida Garcia[,] receiving favorable treatment compared to male officers. Specifically, I provided information that records were being falsified on her behalf to show that she passed her qualification, when she did not.  I believe that I was terminated because of my sex and for providing witness testimony.

*Id.*

On March 14, 2014, Plaintiff was issued a write to sue letter.  *See* Notice of Right to File a Civil Action, Def.'s Mot. Attach. 2 Ex. 28, ECF No. 49-2.  Thereafter, on May 15, 2014,

Plaintiff filed his Original Petition in state court against Defendant alleging causes of action for

sex discrimination and retaliation in violation of the Texas Commission on Human Rights Act

("TCHRA").  *See* Pl.'s Original Pet. and Req. for Disclosure, ECF No. 1-1.  On June 16, 2014,

Defendant removed the Case to this Court on the basis of federal question jurisdiction.  *See*

Notice of Removal, ECF No. 1.[2]  On August 22, 2014, Plaintiff filed a First Amended Petition

adding sex discrimination and retaliation claims arising under Title VII of the Civil Rights Act.

*See* First Am. Pet. ¶¶ 12-13 ("Amended Petition"), ECF No. 6.  The Amended Petition is the live

complaint in the Case.

Following the conclusion of discovery, the parties filed cross motions for summary

judgment.  *See* Def.'s Mot.; Pl.'s Mot.  Defendant responded to Plaintiff's Motion on April 11,

2015, and Plaintiff responded to Defendant's Motion on April 14, 2015.  *See* Def.'s Resp. to Pl.'s

Mot. for Partial Summ. J. ("Defendant's Response"), ECF No. 50; Pl.'s Resp. to Def.'s Mot. for

Summ. J. ("Plaintiff's Response"), ECF No. 54.  Defendant then replied to Plaintiff's Response

on April 28, 2015, and Plaintiff replied to Defendant's Response on April 23, 2015.  *See* Def.'s

Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Defendant's Reply"), ECF No. 58; Pl.'s Reply

to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., ECF No. 56.  Both Plaintiff's Motion and

Defendant's Motion are fully briefed and ripe for resolution.

## II.    DISCUSSION

### A.    Standard

A court must enter summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus.,*

---

[2] *See* 12 U.S.C. § 632 ("Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits.").

*Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).

The court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or "a 'scintilla' of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Further, when reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Thus, the ultimate

inquiry in a summary judgment motion is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

> **B.    Defendant's Motion**

As noted above, the parties in the Case filed cross-motions for summary judgment.  *See*

Pl.'s Mot.; Def.'s Mot.  The Court first analyzes Defendant's Motion.  As a result, for the

purposes of this section only, the Court resolves all factual disputes and draws all inferences in

Plaintiff's favor as non-movant.  *See Little*, 37 F.3d at 1075; *Man Roland*, 438 F.3d at 478-79.

> **1.    Plaintiff's Title VII gender discrimination claim**

In its motion, Defendant argues that Plaintiff cannot establish a prima facie case of sex

discrimination because there is no evidence that Plaintiff was treated less favorably than other

similarly situated female employees.  *See* Def.'s Mot. 11-15.[3]  Defendant further argues that even

if Chief Kirk favored Officer Garcia over other employees in the LEU, paramour favoritism is

not gender discrimination as a matter of law because it adversely affects both male and female

employees equally.  *See id.* at 15-17 (collecting cases).  In his response, Plaintiff "concedes that

his claim of sex discrimination, i.e. that he as a man was treated differently than women, should

not proceed into further litigation."  *See* Pl.'s Resp. 30.

Because Plaintiff agrees with Defendant that he cannot state a cognizable claim for Title

VII sex discrimination, the Court grants Defendant's Motion as to Plaintiff's Title VII sex

discrimination claim as unopposed.  *See id.*

---

[3] When citing to the parties' briefs and motions, the Court uses the pagination assigned by the Court's electronic docketing system.  When citing to depositions contained within the record, the Court uses the pagination that appears on the original transcript.

### 2.    Plaintiff's Title VII retaliation claim

Title VII's anti-retaliation provision makes it unlawful for an employer to retaliate against an employee who opposes an employment practice prohibited under Title VII.  *See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 489 (5th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)).  Where, as here, "direct evidence of retaliation is unavailable, the familiar *McDonnell Douglas* burden-shifting framework applies."  *See Ogletree v. Glen Rose Indep. Sch. Dist.*, 443 F. App'x 913, 917 (5th Cir. 2011); *see also Davis*, 765 F.3d at 489.  Under that framework, Plaintiff bears the initial burden of establishing a prima facie case of retaliation.  *Davis*, 765 F.3d at 489.  This requires Plaintiff to show (1) that he participated in an activity protected by Title VII, (2) that Defendant took an adverse employment action against him, and (3) that a causal connection exists between the protected activity and the materially adverse action.  *Id.* at 489-90.  If Plaintiff successfully establishes all elements of his prima facie case, "'the burden shifts to [Defendant] to state a legitimate, non-retaliatory reason for its decision.'"  *Id.* at 490 (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388-89 (5th Cir. 2007)).  Finally, if Defendant comes forward with a non-discriminatory reason for the adverse employment action, "'the burden shifts back to [Plaintiff] to demonstrate that [Defendant's] reason is actually a pretext for retaliation.'"  *Id.* (quoting *LeMaire*, 480 F.3d at 388-89); *see also Ogletree*, 443 F. App'x at 917.

Defendant raises several arguments pertaining to the first element of Plaintiff's prima facie case – namely, whether Plaintiff engaged in a protected activity.  *See* Def.'s Mot. 19-24. First, Defendant contends that there is no evidence that Plaintiff actually engaged in the alleged protected activities contained within his EEOC charge.  *See id.* at 20-22.[4]  Second, Defendant

---

[4] In support of this contention, Defendant cites portions of Plaintiff's own deposition where he expressly denies having any information that Officer Garcia's training records were falsified.  *See* Def.'s Mot. 21 (citing Diaz Dep. 66:17-25).  Defendant further cites to Plaintiff's interview answers with Mr. Carpenter where Plaintiff expressly denies witnessing Officer Garcia receive favorable treatment as compared to other LEU officers.  *See id.* at 20-21;

argues that any attempt by Plaintiff to rely on conduct outside the scope of his EEOC charge fails because Plaintiff did not exhaust his administrative remedies as to those allegations. *See id.* at 22-24. Third, Defendant asserts that Plaintiff's production of the audio recording to substantiate Lt. Bogle's allegations of a romantic relationship between Chief Kirk and Officer Garcia cannot constitute a protected activity because any belief that paramour favoritism violates Title VII is unreasonable as a matter of law. *See* Def.'s Reply 5-7. Finally, Defendant argues that Plaintiff's interview with Mr. Carpenter similarly does not qualify for protection because Plaintiff mischaracterizes Lt. Bogle's grievance as a complaint of sex discrimination, when in actuality it was merely a list of "numerous issues mostly having to do with a difficult working environment." *See id.* at 7-8.

Plaintiff responds that the documents from Defendant's own investigation reveal that one of Lt. Bogle's concerns was that she had "'been discriminated against based on her gender.'" *See* Pl.'s Resp. 10-11 (quoting Carpenter Memo). As a result, Plaintiff argues, any assistance he provided in connection with the Bogle Complaint automatically entitles him to protection from retaliation under Title VII. *See id.* at 12-13. Plaintiff further argues that Defendant's attempt to limit his claim to the allegations expressly referenced in his EEOC charge is improper, as it is well settled that the scope of a subsequent Title VII lawsuit includes "those claims which could reasonably be expected to grow out of the EEOC's investigation of the claims stated in the charge." *See id.* at 14 (collecting cases).[5]

---

*see also* Pl. Interview Answers (Q: "Have you witnessed Chief Kirk give Officer Garcia preferential treatment?" A: "No").

[5] Although Lt. Bogle's complaint referenced various other discriminatory remarks made by Chief Kirk, including comments based on race, religion, age, and disability, Plaintiff appears to concede that the scope of his retaliation claim is limited to the assistance he provided in connection with Lt. Bogle's complaint of sex and gender discrimination. *See* Pl.'s Resp. 10 n.1. Accordingly, because Plaintiff "focuses only on Lt. Bogle's complaint of sex and gender discrimination," *see id.*, the Court does the same for the purposes of assessing Plaintiff's retaliation claim.

Here, the Court need not resolve whether Plaintiff's participation in the Bogle Complaint constituted a protected activity under Title VII because even if Plaintiff could make the necessary showing to establish a prima facie case, there is insufficient evidence as a matter of law to support a finding that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff is a pretext for unlawful retaliation. *See, e.g.*, *McCoy v. City of Shreveport*, 492 F.3d 551, 561 (5th Cir. 2007) (declining to reach the question of whether the plaintiff suffered an adverse employment action where there was no evidence that Defendant's legitimate, non-discriminatory reason was pretext).

### a.      Legitimate, non-discriminatory reason

Defendant's articulated reason for terminating Plaintiff is a loss of confidence in Plaintiff's ability to perform his job duties due to the manner in which Plaintiff acquired and handled the audio recording between Chief Kirk and Officer Garcia. *See* Def.'s Mot. 8, 17. Specifically, instead of immediately reporting the recorded conversation to bank management, "Plaintiff emailed the recording to his personal email account, deleted it from his work computer, and kept it for nearly 18 months." *See id.* at 17. Because Plaintiff held a management position within the LEU, Defendant argues that he "had a duty to immediately come forward with the recording as opposed to sending it to his personal email account until it best suited him to disclose it." *Id.* at 18.

Plaintiff contends that Defendant's "loss of confidence" reason is vague, and therefore insufficient to establish a non-discriminatory alternative for Plaintiff's termination. *See* Pl.'s Resp. 18-19. Plaintiff further contends that the underlying basis for his termination has evolved over time, and Defendant's "after-the-fact" explanations are insufficient to meet its burden under the *McDonnell Douglas* framework. *See id.* at 19-21.

As noted above, "[i]f the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *See McCoy*, 492 F.3d at 557.  The employer's reason may be subjective provided it "articulate[s] in some detail a more specific reason than its own vague and conclusional feeling about the employee." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004). Put differently, an employer's reason for termination must be articulated "*with 'sufficient clarity'* to afford the employee a realistic opportunity to show that the reason is pretextual." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)).  Nevertheless, the employer's burden "is only one of production, not persuasion, and involves no credibility assessment." *See McCoy*, 492 F.3d at 557.

Applying these standards here, the Court agrees with Defendant that the unauthorized transfer of an audio recording from a bank's security system to an employee's private e-mail account constitutes a legitimate, non-discriminatory reason for termination. *See, e.g.*, *Hoose v. Monroe Cnty.*, No. 09-CV-6080T, 2014 WL 4184815, at *4 (W.D.N.Y. Aug. 21, 2014) (holding that the employer articulated a legitimate, non-discriminatory reason for the plaintiffs' termination where the plaintiffs both admitted to improperly obtaining confidential information from the employer's computers and disseminating that information to third parties).  The nature of Plaintiff's misconduct is especially significant here, as Defendant is a federal reserve bank entrusted with handing sensitive and confidential information as part of its business.  Because Defendant's reasoning is both "clear and reasonably specific," it satisfies Defendant's burden of production under the *McDonnell Douglas* framework.  *See Burdine*, 450 U.S. at 258.  Indeed, other courts have held that an employee's perceived poor judgment in the work place is a legitimate, non-discriminatory reason for the employee's discharge.  *See, e.g.*, *Woods v.*

14

*Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760-61 (2d Cir. 2008) (assistant

principal's perceived poor judgment in directing her staff to copy confidential student records

constituted a legitimate, non-discriminatory reason for her termination); *LaFond v. Gen. Physics

Servs. Corp.*, 50 F.3d 165, 174 (2d Cir. 1995) (employee's perceived recklessness and poor

judgment in sending anonymous letter to company president was sufficient non-retaliatory

reason for termination); *see also Graham v. Gonzales*, 157 F. App'x 139, 141 (11th Cir. 2005)

(poor judgment in the work place, which was supported by clear and specific facts, was

sufficient non-discriminatory reason for not promoting an employee).

  While Plaintiff asserts that an employer's "loss of confidence" in an employee's ability to

perform his job is insufficient to constitute a legitimate, non-discriminatory reason for

termination, he ignores the fact that Mr. Jimenez explained to Plaintiff the basis for Defendant's

loss of confidence on the very same day that Plaintiff was discharged.  *See* Diaz Dep. 107:14-20

("I asked [Mr. Jimenez] why [I was being terminated], and he stated that [it was] because I had

sent that recording to my e-mail address and that the decision to terminate me was from the

top.").  Contrary to Plaintiff's suggestions, that reasoning has not meaningfully wavered at any

point during this litigation.  Indeed, though Defendant may not have expressly referenced a

specific policy violation, or detailed to Plaintiff an exhaustive list of all the ways in which his

conduct fell below the standard Defendant expects of its management-level employees, the

record leaves no doubt that Defendant clearly communicated to Plaintiff that he was terminated

because of the manner in which he acquired and handled the audio recording between Chief Kirk

and Officer Garcia.  *See, e.g.*, Def.'s Resp. to Pl.'s Mot. to Compel Def. to Respond Adequately

to Disc. 1, ECF No. 12 (noting that "Plaintiff's employment was terminated after it was

discovered that he had transferred a recording of a phone conversation between two Federal

Reserve employees from the Bank's system to his personal email account"); Def.'s Resps. to

Pl.'s First Set of Interrogs. and Second Req. for Produc., Interrog. Answer No. 5, Pl.'s Mot.

Attach. 6 Ex. M, ECF No. 46-6 (noting that Defendant terminated Plaintiff after it discovered

that he "transferred a recorded phone call between two Bank employees from the Bank's system

to his own private e-mail account"); Def.'s Mot. 17 ("Plaintiff's employment was terminated due

to a loss of confidence in his ability to perform his duties as Lieutenant II as a result of his

mishandling of private Bank information.").  Plaintiff's arguments to the contrary are without

merit.

Accordingly, because Defendant has articulated a legitimate, non-discriminatory reason

for Plaintiff's discharge, Plaintiff must now come forward with evidence that Defendant's reason

is pretextual.  *See McCoy*, 492 F.3d at 557.

### b.      Pretext

To survive summary judgment, Plaintiff must identify evidence upon which a reasonable

jury could conclude that Defendant's proffered reason was merely pretext for Defendant's real,

retaliatory purpose.  *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir.

2007).  This requires Plaintiff to prove "that [he] would not have been fired but for [Defendant's]

alleged retaliation."  *See id.*; *accord Univ. of Texas Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S.

Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional

principles of but-for causation.").

In his response, Plaintiff identifies the following pieces of evidence that he claims

support an inference that Defendant's proffered reason for his termination is pretext for unlawful

retaliation:  (1) the absence of any "termination letter" in the record detailing the reasons for his

discharge, *see* Pl.'s Resp. 22-23; (2) the nature of the audio recording itself, and the fact that

"casual conversations, such as that 'between two lovers,'" are allegedly not considered confidential under Defendant's policies, *id.* at 23-25; (3) evidence that other officers in the LEU recorded conversations with co-workers, but were not similarly terminated, *id.* at 26-28; and (4) Plaintiff's total lack of any disciplinary history in his over twenty years of employment with Defendant.[6]  *Id.* at 28-30.  The Court addresses each in turn.

First, although Plaintiff is correct that a lack of documentation may, under certain circumstances, serve as evidence of pretext, *see, e.g.*, *Evans v. City of Hous.*, 246 F.3d 344, 355 (5th Cir. 2001), the Fifth Circuit has held that a lack of documentation alone does not suffice to create a genuine issue of material fact at the summary judgment stage.  *See Mire v. Tex. Plumbing Supply Co.*, 286 F. App'x 138, 143 (5th Cir. 2008); *see also Cantu v. Vitol, Inc.*, Civil Action No. H-09-0576, 2011 WL 486289, at *13 (S.D. Tex. Feb. 7, 2011) (noting that a lack of documentation is alone insufficient to establish pretext).  Instead, a plaintiff must point to some other credible evidence "demonstrating the falsity" of the employer's legitimate, non-discriminatory reason.  *See Mire*, 286 F. App'x at 143 (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 n.16 (5th Cir. 2005) (collecting cases)).  Because, as discussed below, Plaintiff has failed to identify any credible evidence demonstrating the falsity of Defendant's legitimate, non-discriminatory reason, the absence of a termination letter or other supporting documentation is insufficient to establish pretext as a matter of law.  *See id.*

Plaintiff's second argument – that his discharge was unjustified because the conversation between Chief Kirk and Officer Garcia was not considered confidential under Defendant's own policies – is equally unavailing.  *See* Pl.'s Resp. 23-25.  As an initial matter, Plaintiff is simply

---

[6] Plaintiff also argues that Defendant's statement that it "lost confidence" in Plaintiff's ability to perform his job is vague, and that the basis for Defendant's loss of confidence has evolved over the course of this litigation.  *See* Pl.'s Resp. 22-26.  Because the Court has already addressed, and rejected, these exact same arguments in the context of Defendant's burden to articulate a legitimate, non-discriminatory reason for Plaintiff's discharge, the Court does not address them a second time here.

incorrect that Defendant's policies authorize the conduct for which he was terminated.  Indeed, the two sources of information that Plaintiff relies upon in support this argument – Mr. Jimenez's deposition testimony, and a Computer Access Agreement – only confirm the wrongfulness of Plaintiff's actions.  For example, Mr. Jimenez repeatedly testified during his deposition that any information created and held on Defendant's equipment is considered non-public "bank property," irrespective of its content.  *See* Jimenez Dep. 42:16-24, 51:4-15, 65:19-66:11.  Similarly, the Computer Access Agreement that Plaintiff signed during his employment clearly states that a bank employee does not have any personal interest in information created or maintained on bank equipment.  *See* Detailed Access Agreement for Computer Users, Pl.'s Mot. Attach. 6 Ex. P, ECF No. 48-6 ("[N]o business or personal information, however classified, which is stored or transmitted using [bank] resources, will be considered private information of any employee or other person, except as required by law.").  Finally, Plaintiff himself acknowledged during his deposition that the audio recording between Chief Kirk and Officer Garcia was Defendant's property.  *See* Diaz Dep. 107:21-108:3.  In light of this evidence, Plaintiff's subjective and unsubstantiated belief that his actions did not violate Defendant's policies is insufficient to establish a genuine issue of material fact as to pretext.  *See, e.g.*, *Salinas v. AT&T Corp.*, 314 F. App'x 696, 699 (5th Cir. 2009) ("A plaintiff's subjective beliefs are not sufficient to create an issue of fact [in connection with a Title VII retaliation claim].").

Moreover, even if Plaintiff was correct that certain recordings, depending on their content, could be distributed outside the bank for personal use without Defendant's permission, this fact would not alone support the inference that Plaintiff was the victim of retaliation.  As the Fifth Circuit recently noted, the "analysis of whether an alleged violation of an employer's policy is a pretext for discrimination does not turn on whether the employee in fact violated the

policy, but rather whether the employer reasonably believed the employee violated the policy and acted based on that belief." *See Chamblee v. Miss. Farm Bureau Fed'n*, 551 F. App'x 757, 760 (5th Cir. 2014). Here, there is no evidence in the record supporting an inference that Mr. Jimenez did not reasonably believe that Plaintiff's conduct was wrongful. As a result, Plaintiff's attempt to justify his actions under Defendant's policies is ultimately unpersuasive.

The third piece of evidence that Plaintiff points to in his attempt to establish pretext is that other individuals in the LEU knowingly recorded conversations with co-workers, but were not similarly terminated. *See* Pl.'s Resp. 26 (arguing that Defendant "did not apply its supposed neutral policy equally among employees"). Plaintiff is correct that there is evidence in the record that both Lt. Bogle and Chief Kirk recorded conversations between themselves and co-workers while on Defendant's premises. *See* Lt. Bogle Dep. 99:21-100:7, 101:12-103-7; *see also* Carpenter Memo (noting that Chief Kirk "stated that he routinely records conversations that he has with his staff"). Plaintiff is also correct that disparate treatment is one way in which an employee can prove that his employer's reason for termination is pretextual. *See, e.g.*, *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). However, disparate treatment is only relevant where the plaintiff and his comparator are treated differently "under 'nearly identical' circumstances." *Id.* (quoting *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001)). Here, Lt. Bogle testified that she used a personal digital voice recorder to capture conversations between herself and other staff members. *See* Lt. Bogle Dep. 102:3-11. Although the record is less than clear as to the circumstances underlying Chief Kirk's conduct, there is no evidence in the record that would support a reasonable inference that Chief Kirk misappropriated recordings created on bank equipment for personal use. In contrast, Plaintiff admits that he transferred a recording *created by Defendant* in the course of Defendant's

business to his private e-mail account, and stored it there for eighteen months.  *See* Diaz Dep.

107:21-108:3.  Because "recordings created and stored on Bank equipment are considered Bank

property," *see* Decl. of Javier Jimenez ¶ 5; Diaz Dep. 107:21-108:3, Plaintiff's conduct is not

"nearly identical" to the actions of Lt. Bogle and Chief Kirk.  As a result, there is no disparate

treatment, and Plaintiff's third argument is also insufficient to establish pretext.  *See Bryant*, 413

F.3d at 478 (rejecting employee's disparate treatment argument because "the alleged theft of

alcohol, party decorations, and table decorations is not the same as stealing money from a

client's gift table at a catered event").

Plaintiff's final argument focuses on his positive performance evaluations and the fact

that he had never before been written-up or disciplined in his over twenty years of employment.

*See* Pl.'s Resp. 28-30.  While this type of evidence would certainly be relevant to proving pretext

if Defendant terminated Plaintiff on the basis of poor performance, *see, e.g.*, *Evans*, 246 F.3d at

355, it is undisputed that Plaintiff engaged in the one act of misconduct that led to his

termination in the Case.  *See* Diaz Dep. 86:11-87:17, 91:20-23, 99:2-14.  Accordingly, Plaintiff's

positive evaluations and lack of disciplinary history do not speak to the veracity of Defendant's

legitimate, non-discriminatory reason for his termination.  *See, e.g.*, *Gobert v. Saitech, Inc.*, 439

F. App'x 304, 306-07 (5th Cir. 2011) ("[P]erformance reviews and [a] promotion do not speak to

[an employee's] actions immediately preceding his termination—the actions that [the employer]

says caused his termination."); *see also Ewell v. NBA Props., Inc.*, --- F. Supp. 3d ----, 2015 WL

1348497, at *12 (D.N.J. Mar. 23, 2015) (noting that where an employer terminates an employee

for a "well-documented, specific instance of poor judgment," the employee's "positive

performance evaluations are not significant" to proving pretext).  As a result, it is not for this

Court to question the wisdom of Defendant's business decision.  *See LeMaire*, 480 F.3d at 391

("Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones.").

In sum, because there is no evidence that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff is pretext for unlawful retaliation, Plaintiff's Title VII retaliation claim must be dismissed.  *See McCoy*, 492 F.3d at 562.

### 3.   Plaintiff's TCHRA claims

Defendant moves for summary judgment on all of Plaintiff's claims, including his claims arising under the TCHRA.  *See* Def.'s Mot. 27 n.1.  It is well settled that "the law governing claims under the TCHRA and Title VII is identical."  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403-04 n.2 (5th Cir. 1999); *see also Prewitt v. Cont'l Auto.*, 927 F. Supp. 2d 435, 452 (W.D. Tex. 2013) ("The analysis of a claim under the TCHRA is identical to that under Title VII, upon which the TCHRA's provisions are modeled.").

Here, because Plaintiff concedes that his Title VII gender discrimination claim should not proceed to trial, *see* Pl.'s Resp. 30, his TCHRA gender discrimination claim based on the same allegations is also subject to dismissal.  *See Shackelford*, 190 F.3d at 403-04 n.2; *see also Prewitt*, 927 F. Supp. 2d at 452.  Similarly, because the Court finds that Defendant is entitled to judgment as a matter of law on Plaintiff's Title VII retaliation claim, the Court also grants Defendant's motion as to Plaintiff's TCHRA retaliation claim.  *See Shackelford*, 190 F.3d at 403-04 n.2; *see also Prewitt*, 927 F. Supp. 2d at 452.

### C.   Plaintiff's Motion

Plaintiff filed his own motion for summary judgment regarding his Title VII retaliation claim.  *See* Pl.'s Mot. 6.  As explained in detail above, however, because the Court finds that there is no evidence that would allow a reasonable jury to conclude that Plaintiff was the victim

of unlawful retaliation, the Court denies Plaintiff's Motion.

## II.     CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following relief:

**IT IS ORDERED** that Plaintiff's Motion, ECF No. 48, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion, ECF No. 49, is **GRANTED** in

its entirety.

The Clerk shall close the Case.

**SO ORDERED.**

SIGNED this 20th day of July, 2015.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE